**FIRST TITLE COMPANY OF WACO and Alamo Title Insurance of Texas, Petitioners,**

v.

**Charles GARRETT and Dorinda Garrett, Respondents.**

No. D–0621.

Supreme Court of Texas.

June 9, 1993.

Rehearing Overruled Sept. 29, 1993.

R. Michael Garrett, Dallas, for petitioner.

Greg White and Andy McSwain, Waco, for respondents.

## OPINION

SPECTOR, Justice.

In this cause we consider the circumstances in which a non-settling defendant, faced with an adverse judgment, may claim a credit for amounts received by the plaintiff in settlement of a separate lawsuit. Applying the "one satisfaction" rule, this court has held that a non-settling defendant may reduce its liability by the amount of a settlement entered into by a settling defendant in the same lawsuit. *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 8 (Tex.1991).

Here, the court of appeals affirmed a trial court judgment which (1) found two title companies liable under the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA"), Tex.Bus. & Com.Code §§ 17.41–.63, and (2) disallowed a settlement credit because these non-settling defendants had not supplied any evidence that the settling parties in a separate lawsuit were joint tortfeasors. 802 S.W.2d 254, 263. We agree that the defendants were properly found liable under the DTPA. However, we also conclude that the record establishes, as a matter of law, that the settlement payments compensated a common indivisible injury. Accordingly, we reverse the judgment of the court of appeals and remand this cause to the trial court for proceedings consistent with this opinion.

I.

In September of 1986, Charles and Dorinda Garrett contracted to purchase nine acres of land from Raymond Jenkins and James Dameron for use as an automobile salvage yard. Just over one year earlier, Jenkins and Dameron had obtained the land by a deed containing a restrictive covenant; the covenant provided that the land could not be used for any "noxious or offensive activity, which by example only, would include junk yard or auto salvage yard and all similar activities. . . ."

The Garretts were never told of this covenant, which clearly prohibited the use for which they intended the property. The Garretts relied on the representations of First Title Company of Waco and Alamo Title Insurance of Texas in finalizing the purchase. First Title Co. conducted a title search, but failed to discover the restrictive covenant that was actually listed within their files; Alamo Title issued a title commitment affirmatively representing that no restrictive covenants appeared in the county deed records.

The Garretts finalized the purchase, and began to prepare the property for use as an auto salvage yard. Alice Faye Heitkamp Landry, who sold the tract to Jenkins and Dameron, and out of whose larger holdings the tract was carved, objected and successfully obtained an injunction prohibiting the

Garretts from using the land as an auto salvage yard in violation of the restrictive covenant.

The Garretts then sued Jenkins and Dameron for their misrepresentations, and subsequently received $69,000 in settlement of the claims.[1] On July 19, 1988, the Garretts filed a separate lawsuit, the one that is the basis of this appeal, charging First Title Co. and Alamo Title with negligence and breach of the DTPA. The jury found that First Title Co. and Alamo Title proximately caused injuries to the Garretts, and returned a verdict in favor of the Garretts for $85,500; the jury was never asked to make any findings with regard to Jenkins and Dameron, or to make any apportionment of comparative negligence. In a motion for judgment notwithstanding the verdict, First Title Co. and Alamo Title requested that the $69,000 settlement with Jenkins and Dameron be credited against the amount of the judgment. The trial court overruled the motion.

After calculating prejudgment interest, the trial court rendered judgment against First Title Co. and Alamo Title for $101,952.84 plus attorney's fees; there was an additional award of $13,460.85 rendered against Alamo Title only. The court of appeals affirmed the trial court's decisions in all respects. 802 S.W.2d 254. On motion for rehearing, the court of appeals issued a supplemental opinion holding that First Title Co. and Alamo Title were not entitled to a credit based on the collateral settlement, because they had not met their burden of establishing that Jenkins and Dameron were joint tortfeasors. 802 S.W.2d at 262–63.

## II.

Initially, apart from the settlement credit issue, the title companies contest the jury's underlying finding of DTPA liability. The title companies argue that the contract entered into with the Garretts was one of in-

demnity, not of guaranty; so, any incorrect representation as to the status of the property should subject them to liquidated damages under the insurance policy, not damages for misrepresentation under the DTPA. We disagree.

Under Texas law, when a seller makes an affirmative representation, the law imposes a duty to know whether that statement is true. *See, e.g., Robinson v. Preston Chrysler–Plymouth, Inc.,* 633 S.W.2d 500, 502 (Tex.1982) (discussing the relationship of seller and buyer). In the context of title insurance, this principle requires that a title insurer be held responsible for an affirmative representation that is the "producing cause" of damages to the party purchasing the insurance. TEX.BUS. & COM.CODE § 17.50(a); *see also Weitzel v. Barnes,* 691 S.W.2d 598, 600 (Tex.1985).

The title commitment contains the following representation as to the state of the title:

THE POLICY WILL BE SUBJECT TO ... THE FOLLOWING MATTERS WHICH WILL BE ADDITIONAL EXCEPTIONS FROM THE COVERAGE OF THE POLICY:

THE FOLLOWING RESTRICTIVE COVENANTS OF RECORD ITEMIZED BELOW ... (INSERT SPECIFIC RECORDING DATA OR STATE "NONE OF RECORD"): *NONE OF RECORD.*

(Emphasis added.) The italicized language clearly represents that there were no restrictive covenants in the county deed records. Significantly, this language was included *as part of the title commitment,* for the purpose of making some representation to the parties involved in the transaction. Indeed, the record includes testimony from officials in the title companies acknowledging that purchasers often rely on title companies' assessments of the state of the title.[2] There is

---

1. The terms of the settlement provided that the Garretts would receive $62,000 in cash plus forgiveness of a $7,000 promissory note which was executed by the Garretts and payable to Jenkins and Dameron.

2. For example, the direct examination of John Hugh Johnson, President and Manager of First Title Co., includes the following exchange:

Q: ... The commitment also serves to show the parties to the transaction what the status of the public record is with regard to that property, doesn't it?
A: Yes, sir.
Q: And you know that at the time that you send it out, that people are going to rely on it?

further testimony from the Garretts indicating that they had expressed their interest in "something in writing" verifying clear title before purchasing the property. Based on the evidence in the record, we believe the jury could properly have found that the Garretts acted reasonably in viewing the quoted paragraph as a representation of the state of the property's title, thereby causing the damages they suffered.[3] The title companies' argument that there is no evidence to support the jury's findings is without merit.[4]

### III.

The title companies also claim relief from liability because a clause in the title commitment allegedly protects them from claims such as the Garretts'. The language of the disclaimer is as follows:

> The policy to be issued pursuant to this commitment does not guarantee that the insured property has adequate title to allow it to be used, sold, transferred, leased, or mortgaged for any purpose intended by the purchaser nor will it provide coverage for possible loss of opportunity or economic expectation.

In support of their argument, the title companies analogize the present case to *Stewart Title Guaranty Co. v. Cheatham*, 764 S.W.2d 315 (Tex.App.—Texarkana 1988, writ denied), a case also involving a title company and its ability to disclaim liability for any reliance by the consumer. We disagree that *Cheatham* can be read to relieve First Title Co. and Alamo Title from liability.

In *Cheatham*, the court of appeals focused on the fact that the title insurance policy contained specific language explaining the limited purpose for which the results of the title company's search efforts could be used. A portion of the policy stated:

> [I]t is to facilitate preparation of the necessary instruments, to point out curative requirements, if any, and *to show the results of the Company's title search (upon which only the Company may rely). None of the information contained herein, or the absence of other information, constitutes a representation to any party, other than the Company, as to the status of the title.*

*Cheatham,* 764 S.W.2d at 320 (emphasis added). Given such clear language, the court of appeals concluded that the title report could not serve as the basis of an actionable representation. The court also noted that, irrespective of the contractual language, the evidence in the record established that the property purchasers had not even relied on the statements in the title report. *Id.* Unlike the title report in *Cheatham,* the title report in the present case contains misrepresentations actually causing the damages suffered; and neither First Title Co. nor Alamo Title defined the title reports as being for a limited purpose.

▮▮▮▮ As implied by its name, the DTPA's purpose is "to protect consumers against false, misleading, and deceptive business practices." Tex.Bus. & Com.Code § 17.44. Although we decline to disapprove all contractual caveats against reliance, we agree with the court of appeals that when representations are made, a consumer cannot waive DTPA protection. *See id.* § 17.42(a) (stating

---

A: We assume that they could or they couldn't. You know, they can.
Q: But you know that it's customary and usual for them to do so, don't you?
A: Yes.

3. The dissenting opinion argues that the policy language amounts to no more than a promise that "I will pay you damages if there is a restrictive covenant on your property." 860 S.W.2d at 79. Effectively, however, First Title's assurance that there were "none of record" was tantamount to an additional promise: "And further, there are no restrictive covenants of record on your property."

4. Our decision today also comports with the factually similar case of *Great Am. Mortgage Inves-*

*tors v. Louisville Title Ins. Co.,* 597 S.W.2d 425 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.). In that case, the title insurer erroneously wrote "none" in the space reserved for the listing of restrictive covenants in the county deed records. *Id.* at 428. The court of appeals noted that these were the appropriate circumstances for finding an actionable misrepresentation. However, there was evidence that the party alleging fraud had actual prior knowledge of the unrevealed restrictive covenant, and therefore was held not to be entitled to recovery based on any alleged reliance on the title insurer's statements. Nevertheless, the court made clear that "under the proper circumstances the tort of negligent misrepresentation can apply to title insurers." *Id.* at 430.

that, absent affirmative proof by a defendant that a consumer is not in a significantly disparate bargaining position, "[a]ny waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void"); *see also Hycel, Inc. v. Wittstruck*, 690 S.W.2d 914, 922 (Tex. App.—Waco 1985, writ dism'd by agr.) (noting that § 17.42 reflects "the legislature's disapproval of efforts or ruses designed to avoid liability under the DTPA"). Accordingly, we hold that the clause purporting to waive the Garretts' DTPA protection from affirmative misrepresentations is invalid.

Absent a valid disclaimer, the Garretts were entitled to seek damages based on the title companies' affirmative misrepresentations. Because there is evidence supporting the jury's findings that such representations proximately caused damages to the Garretts, we will not disturb the lower courts' rulings on the title companies' liability.

## IV.

■■ Having determined that the courts below properly imposed liability on the title companies, we now address the settlement credit issue. Texas has four different contribution schemes; the appropriate scheme is determined by referring to the theories of liability by which a tortfeasor has been found culpable. *Sterling*, 822 S.W.2d at 5 (citing *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 20 (Tex.1987)). Because the petitioners were found to have been negligent and liable under the DTPA, this cause is governed by the basic statutory provisions for contribution, Texas Civil Practice and Remedies Code sections 32.001–.003, as expanded by the common law.[5] The statutes alone do not address the effects of a partial settlement on the contribution rights between joint tortfeasors.

■ As we noted in *Sterling*, a prevailing party is entitled to only "one satisfaction" for an injury. *Sterling*, 822 S.W.2d at 5 (quoting *Bradshaw v. Baylor Univ.*, 126 Tex. 99, 84 S.W.2d 703, 705 (1935)). That is, when a plaintiff files suit alleging that multiple tortfeasors are responsible for the plaintiff's injury, any settlements are to be credited against the amount for which the liable parties as a whole are found responsible, but for which only the non-settling defendant remains in court. The rationale for this doctrine is that the plaintiff should not receive a windfall by recovering an amount in court that covers the plaintiff's entire damages, but to which a settling defendant has already partially contributed. The plaintiff would otherwise be recovering an amount greater than the trier of fact has determined would fully compensate for the injury. *Bradshaw*, 84 S.W.2d at 705.

## V.

The title companies contend that the lower courts erred in not recognizing that the Garretts' injury was "indivisible," that is, an injury that may have been caused by distinct actors but is so singular in character as to render apportionment of fault impossible; each tortfeasor is said to have contributed to the whole. The significance that the title companies attach to such indivisibility is that if the settling parties are partially responsible for such an injury, then as a matter of law the judgment should be reduced by the amount of any settlements so as to prevent double recovery by the prevailing plaintiff. *See Sterling*, 822 S.W.2d at 7–8 (holding that a settlement credit was appropriate when the settling parties had contributed to a single indivisible injury suffered by the plaintiff).

■ Any party seeking the benefit of a settlement credit has the burden of establishing that it is entitled to such a reduction in

---

**5.** The former comparative negligence statute, Tex.Civ.Prac. & Rem.Code §§ 33.001–.017 (Vernon 1986), *amended by* Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.04, applies only to "pure negligence" cases filed before September 2, 1987. The current comparative responsibility statute, Tex.Civ.Prac. & Rem.Code §§ 33.001–.016 (Vernon 1992), applies primarily to cases filed on or after September 2, 1987, that involve "pure neg-

ligence," strict liability, and breach of warranty; the limited exceptions do not apply to the present case. The common-law comparative-causation scheme enunciated by this court in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), applies in cases of strict products liability and breach of warranty, and does not apply to DTPA cases. *See Sterling*, 822 S.W.2d at 6 & nn. 6, 7.

the amount of the judgment. *See, e.g., Howard v. General Cable Corp.*, 674 F.2d 351, 358 (5th Cir.1982); *Hill v. Budget Fin. & Thrift Co.*, 383 S.W.2d 79, 82 (Tex.Civ.App.—Dallas 1964, no writ). Here, the title companies have placed into the record the settlement agreement from the lawsuit involving Jenkins and Dameron, and the order of dismissal from that case.

The settlement agreement shows that all parties denied any liability, but there are other statements addressing the merits of that lawsuit and what the settlement was intended to remedy. The agreement establishes that the Garretts made claims based on "alleged misrespresentations made by Jenkins and Dameron when they sold land to the Garretts," whereby the Garretts sought to recover "money, rescission of the sale of land and ... attorney's fees...."

■ By its terms, the settlement agreement covers the same injury for which the title companies were found liable in the present lawsuit: the Garretts obtained a parcel of land worth less than it was represented to be worth, and sustained both immediate and consequential damages stemming from this purchase. Although not adjudicated to be joint tortfeasors, the title companies and the sellers cannot reasonably be said to have caused separate injuries. Accordingly, because the present cause and the settlement of the related lawsuit both compensate an indivisible injury, the title companies are entitled to offset the final judgment by the amount of the settlement.

Today we reaffirm that the "one satisfaction" rule of *Bradshaw* and *Sterling* prohibits a plaintiff from recovering twice for a single injury. We therefore reverse the judgment of the court of appeals and hold that the title companies are entitled to a credit of $69,000 against the judgment. We remand this cause to the trial court for proceedings consistent with this opinion.

Dissenting opinion by Justice HECHT joined by Chief Justice PHILLIPS, Justice CORNYN, and Justice ENOCH.

HECHT, Justice, dissenting.

If someone says, "there is no restrictive covenant on your property," when actually there is, the statement is a misrepresentation. It asserts as fact what is demonstrably false. But if someone says, "I will pay you damages if there is a restrictive covenant on your property," that statement is not a representation that no such covenant exists; rather, it is a promise that if a covenant does exist, any resulting harm will be paid for. And if the promise is kept, the statement was not false but true. The Court does not appear to grasp the distinction between these two statements. It treats the promise of insurance as the equivalent of a statement that no restrictive covenants exist. Because the distinction is important in the law as well as this case, I dissent.

In this case, Charles and Dorinda Garrett paid $46,318.20 for a 9.081–acre tract of land on which they intended to operate an auto wrecking and salvage yard. The Garretts sought and received from their sellers assurances that no restrictive covenant on the property prevented their intended operation. One of the sellers obtained from First Title Company of Waco the commitment of its principal, Alamo Title Insurance of Texas, to issue a policy of title insurance. That commitment stated:

> SCHEDULE B OF THE POLICY OR POLICIES TO BE ISSUED WILL ALSO CONTAIN THE FOLLOWING EXCLUSIONS AND EXCEPTIONS:
> THE POLICY WILL BE SUBJECT TO ... THE FOLLOWING MATTERS WHICH WILL BE ADDITIONAL EXCEPTIONS FROM THE COVERAGE OF THE POLICY:
> 1. THE FOLLOWING RESTRICTIVE COVENANTS OF RECORD ITEMIZED BELOW ...: NONE OF RECORD

The commitment does not say that there are no restrictive covenants of record on the property the Garretts proposed to buy. It says that a title policy will issue which will not except any restrictive covenants of record. The statement was true: at the closing of the sale, Alamo Title issued the Garretts its title insurance policy in accordance with

its commitment. The Garretts paid the premium for the policy.

Documents in First Title's files, which it overlooked, showed that the Garretts' property was subject to a restrictive covenant prohibiting the operation of an auto salvage yard on the property. Shortly after the Garretts opened their business, a neighboring landowner complained and eventually obtained an injunction against their operation. The Garretts sued their sellers and obtained $69,000.00 in settlement of their claims. The Garretts then brought this suit against Alamo Title and its agent, First Title. In addition to their claim against Alamo Title under its policy for the reduction in market value of the property due to the restrictive covenant, which the parties stipulate to be $4,618.00, the Garretts assert two other causes of action against both defendants. The Garretts allege that the title insurance commitment misrepresented that there were no restrictive covenants on the property, and that defendants are liable under the Texas Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Com.Code §§ 17.41–.63 ("DTPA"), for damages caused by this misrepresentation. The Garretts also allege that defendants were negligent in failing to disclose the existence of the restrictive covenant.

Trial was to a jury, which found that the title insurance commitment represented that the Garretts' property "had approval, characteristics, uses, benefits, or qualities that it did not have", and "was of a particular standard, quality, or grade, if it was of another". *See id.* § 17.46(5), (7). The jury also found that First Title was negligent in failing to discover the restrictive covenant and disclose it in the commitment. The jury found that the misrepresentations and negligence caused the Garretts to sustain damages totaling $85,500.00: $8,000.00 interest, $8,000.00 past mental anguish, $30,000.00 lost profits, and $39,500.00 for "the difference between the current fair market value of the property as improved and the reasonable amount paid for the property and any necessary improvements." The trial court rendered judgment for the Garretts for $200,413.69: $85,500.00 awarded by the jury, $2,000.00 statutory damages under the DTPA, $4,618.00 on the

policy, $15,000.00 attorney fees in the suit against the sellers, $50,000.00 attorney fees for trial of this suit, $35,000.00 attorney fees for appeal of this suit, and $16,295.69 prejudgment interest, less $8,000.00 previously paid by defendants. In sum, for a title defect which reduced the value of their property by $4,618.00, the Garretts recovered damages, attorney fees, interest and a settlement totaling $277,413.69.

On appeal, defendants contend not only that they are entitled to a credit on the Garretts' judgment against them for the $69,-000.00 recovered from the sellers, but that they are not liable at all under the DTPA or in negligence. The court of appeals rejected all defendants' arguments. Regarding liability for negligence, the court acknowledged: "Ordinarily, a title insurance company does not owe a duty to the insured to discover and disclose a title defect. *Stewart Title Guar. Co. v. Cheatham*, 764 S.W.2d 315, 319 (Tex. App.—Texarkana 1988, writ denied)." 802 S.W.2d at 257. Nevertheless, the court held that a State Board of Insurance rule "places a duty on the insurer to discover and disclose restrictive covenants, and creates an exception to the general rule of no duty to disclose." *Id.* The court also held that the general rule does not preclude liability for misrepresentations under the DTPA:

> Thus, a title insurer can be liable under the DTPA for affirmatively misrepresenting that a title defect does not exist, even if it owes no duty to discover and disclose the defect.... Alamo Title's misrepresentation, that no restrictive covenants appeared of record, was actionable under the DTPA regardless of whether it owed a duty to disclose the defect to the Garretts.

*Id.* at 257–58 (citations omitted). The appeals court affirmed the trial court's judgment.

I agree with the Court that defendants are entitled to a credit for the $69,000.00 which the Garretts' sellers paid in settlement. I would also hold, however, that the Garretts may recover only on their title insurance policy and not under the DTPA or for negligence.

The Garretts' DTPA action is based upon their assertion that the language in the title insurance commitment which I have quoted above misrepresents the state of the title to their property. It quite plainly does not. In fact, it says nothing at all about title to the property. It contains the words, "none of record" in the same sentence with the words "restrictive covenants", but the mere physical proximity of these phrases does not say that there are no restrictive covenants of record. One must read the rest of the sentence. The quoted language says that a title policy will issue excepting and excluding no restrictive covenants of record. This statement (about a future event) was absolutely true: a policy did issue which excepted no restrictive covenants. The statement in the commitment misrepresents nothing; to the contrary, it states exactly what occurred.

The Garretts assert that they were very concerned about the existence of restrictive covenants on the property, and that they took from the statement in the title insurance commitment that no such covenants existed. There is no reason to question these assertions, but the Garretts' anxieties and expectations cannot transform a statement about what will be excluded from a title policy into a statement about the title of property. The Garretts may have misunderstood the commitment, but they could not have been misled by it.

The Court cites testimony of First Title's president to the effect that it is customary and usual for people to rely upon a title policy commitment to state the public record of title. From this testimony the Court concludes that the purpose of the commitment is to represent the status of title to the parties to a transaction. This conclusion does not follow from the testimony on which it is based. The reason one may suppose that a title policy commitment lists restrictions or defects in the title to property is that the title company has a financial interest in not insuring against certain contingencies. Since it is in the title company's interest to list all the exceptions it will not insure against, one may usually suppose the list to be complete. That supposition, although entirely reasonable in most instances, does not transform a statement about what the title insurance will cover to one about what the status of title is.

The existence of a restrictive covenant on the Garretts' property which defendants did not acknowledge when they issued the title policy does not violate the DTPA. If it did, every claim against a title policy would also be a DTPA claim against the insurer. The purpose of the policy is to indemnify the insured against the possibility that there are title defects unrecognized at the time the policy issues. The policy does not represent that no defects exist, only that if they do, the insurer will pay specified damages. The issuance of a policy that may require payment of a claim is the purpose of title insurance; it is not a violation of the DTPA. *See Cheatham*, 764 S.W.2d at 318–20.

Of course, this does not mean that title insurers are immune from liability under the DTPA. They may be liable under that statute as any other person. Had defendants told the Garretts that there were no restrictive covenants of record, they could be liable under the DTPA for that misrepresentation. But the commitment does not make that representation, and it is the only communication the Garretts claim to have had with defendants. In the circumstances of this case, there is no evidence that defendants violated the DTPA.

The Garretts also contend, and the jury found, that defendants were negligent in failing to discover and disclose the existence of the restrictive covenant. The Court does not address this contention, which is without merit. Before the Garretts can recover for negligence, they must demonstrate that defendants had a duty to discover and disclose defects in title, which they breached. As the court of appeals recognized, as a rule, title insurers have no such duty. There is no reported decision in Texas to the contrary. Most recently, in *Martinka v. Commonwealth Land Title Ins. Co.* 836 S.W.2d 773, 777–78 (Tex.App.—Houston [1st Dist.] 1992, writ denied), the court summarized the several cases which have addressed the issue as follows:

Title insurance is a contract of indemnity. [*Southern Title Guar. Co. v. Prendergast*, 494 S.W.2d 154, 158 (Tex.1973), *aff'g* 478

S.W.2d 806 (Tex.Civ.App.—Houston [14th Dist.] 1972)]; *Tamburine v. Center Sav. Ass'n*, 583 S.W.2d 942, 947 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). The relationship between the parties to the contract is basically limited to that of indemnitor and indemnitee. *Houston Title Co. v. Ojeda De Toca*, 733 S.W.2d 325, 327 (Tex.App.—Houston [14th Dist.] 1987), *rev'd on other grounds [sub nom. Ojeda de Toca v. Wise]*, 748 S.W.2d 449 (Tex.1988), *aff'd as modified*, 761 S.W.2d 467 (Tex.App.—Houston [14th Dist.] 1988, no writ); *Tamburine*, 583 S.W.2d at 947.

A title insurance company is not a title abstractor and owes no duty to examine title. *See Tamburine*, 583 S.W.2d at 947. Further, the only duty a title insurance company has to its insured is to indemnify him against loss suffered by defects in title; the title insurance company owes no duty to point out any outstanding encumbrances. *Ojeda De Toca*, 733 S.W.2d at 327, citing *Wolff v. Commercial Standard Ins. Co.*, 345 S.W.2d 565, 569 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.); *Tamburine*, 583 S.W.2d at 947. In other words, the title insurance company is not employed to examine title, rather it is employed only to guarantee the status of title and to insure against existing defects. *Ojeda De Toca*, 733 S.W.2d at 327. As the court in *Tamburine* correctly stated:

> [The title insurance] company, before issuing a policy of title insurance, must necessarily take steps to inform itself of the status of the title to be insured. In the search for the information upon which must depend the decision to either issue or decline to commit itself to a policy, the insurance company obviously investigates the title for its own use and benefit to determine whether it will undertake the risk. The title information on which the company bases its decision relates to the condition of the title held by the grantor and is not made for the prospective grantee or lienholder to whom the policy will finally issue.

*Tamburine*, 583 S.W.2d at 948–49.

Similarly, the court stated in *Stone v. Lawyers Title Ins. Corp.*, 537 S.W.2d 55, 65 (Tex. Civ.App.—Corpus Christi 1976), *rev'd on other grounds*, 554 S.W.2d 183 (Tex.1977): "No cause of action for negligence exists against a title company for failure to discover defects in title prior to the issuance of the title policy. The very nature of the relationship between the parties precludes any recovery for negligence."

Notwithstanding the general rule that title insurers have no duty to discover and disclose title defects, the court of appeals found an exception for restrictive covenants under Rule P–4 of the "Procedural Rules and Definitions" adopted by the State Board of Insurance pursuant to 28 TEX.ADMIN.CODE § 9.1 (West 1988). That rule states in pertinent part: "When the examination [i.e., title examination] does not disclose that restrictive covenants affect the applicable land, lien or estate, the [title insurance] Company shall indicate "None of Record" after the restrictive covenant exception prescribed in policy forms." This rule imposes no duty of discovery on title insurers. No examination is mandated, and no standards for any examination conducted are set. The rule does require disclosure, but only of the results of the examination, not of the state of the title. It does not require the title insurer to state that it has determined that there are no restrictive covenants of record, only that its examination has not disclosed such covenants. The court of appeals' conclusion that Rule P–4 creates a general duty of discovery and disclosure simply has no support in the language of the rule. Moreover, defendants in this case fully complied with Rule P–4. Their examination did not disclose a restrictive covenant, and accordingly they indicated "None of Record" after the restrictive covenant exception in the commitment form, just as the rule required.

Although the law imposes no duty on title insurers to discover and disclose title defects, they may undertake such a duty, just as abstractors do. Thus, in *Great American Mortgage Investors v. Louisville Title Ins. Co.*, 597 S.W.2d 425 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.), the court determined that a title insurer had not merely failed to except a deed restriction from the title policy, but had erroneously stated that

no restrictions existed. Assuming the accuracy of that determination (the basis of which is not disclosed in the court's opinion), the court correctly concluded that the title company could be liable for its misstatement:

> It is well settled that even though one does not have a duty to act, if one acts voluntarily, he must do so with due care and is generally liable for negligence. In our case whether the title insurer had the duty to disclose the existence of the deed restrictions is immaterial because the [mortgage information letter] and the title binder actually represented that no deed restrictions were in existence. Having made the representation the title insurer is held to the standard of reasonable care and may under the proper circumstances be liable in tort for damages caused by a negligent misrepresentation. In other words, under the proper circumstances the tort of negligent misrepresentation can apply to title insurers.

*Id.* at 430. By contrast, defendants in this case made no such representations.

Persons who undertake to represent the state of title to property may be liable for their misrepresentations. Title abstractors accept this undertaking regularly. Title insurance companies do not. The purpose of title insurance is not to describe the state of title but to insure against a loss in value due to undisclosed defects. To impose upon title insurers the same responsibility undertaken by abstractors would be to render title insurance useless. Having chosen a title policy, one cannot impose upon the insurer the same duty an abstractor would have assumed.

For these reasons, I would reverse the judgment against First Title and Alamo Title awarding damages for negligence and under the DTPA. I therefore dissent.

Chief Justice PHILLIPS, Justice CORNYN, and Justice ENOCH join in this Dissenting Opinion.