# Supreme Court of Texas

No. 22-0168

Bay, Ltd.,

*Petitioner*,

v.

The Most Reverend Wm. Michael Mulvey, S.T.L., D.D. Bishop of Corpus Christi,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued October 3, 2023**

JUSTICE HUDDLE delivered the opinion of the Court.

Our settlement-credit cases detail the evidentiary burden each party must satisfy to obtain or avoid a settlement credit. If a defendant proves that a plaintiff has settled with someone else, the defendant is entitled to a credit in the amount of the settlement, unless the plaintiff proves that part or all of the settlement was for an injury other than the one for which the plaintiff seeks recovery. This is simple enough, in most cases.

The wrinkle here is that the defendant asserts he is entitled to a settlement credit based on an agreement that does not plainly define a settlement amount, as settlement agreements typically do. And while the agreement states that the settling defendant caused the plaintiff multiple distinct injuries, there is no evidence allocating value to most of them. Instead, the agreement includes mutual covenants to nonsuit pending claims and requires the settling defendant to pay the plaintiff $750 per month to avoid execution of a $1.9 million agreed final judgment. The parties dispute (1) whether the agreement is a settlement agreement at all and (2) if so, the proper amount of the settlement credit. We hold the agreement constitutes a $1.9 million settlement agreement. Because the agreement allocated $175,000 of that amount to another injury, we affirm the court of appeals' take-nothing judgment based on its application of a $1.725 million settlement credit.

## I.    Background

Bay, Ltd. is a development and construction company. It employed Michael Mendietta as a division manager for trucking and materials. Mendietta, in his personal capacity, began leasing the Ben Bolt Ranch from the Most Reverend Wm. Michael Mulvey, the Bishop of the Diocese of Corpus Christi.[1] The fifteen-year hunting lease required Mendietta to make certain improvements to the ranch at his expense. Mendietta used Bay's materials, equipment, and employees to make the improvements, but he did so without Bay's consent. After Bay

---

[1] A family donated the 978-acre ranch to help the Diocese generate funds through hunting leases.

discovered this, it brought this suit in Jim Wells County against Mendietta and Mulvey. As to Mulvey, Bay asserted it was entitled to recover the value of Mendietta's improvements to the ranch based on an unjust-enrichment theory.

But Bay's entanglement with Mendietta extended far beyond this suit. Bay discovered that Mendietta, without authority, also used Bay's materials and labor to improve Mendietta's homestead and other properties, used Bay's credit card for his personal benefit, and diverted to himself customer payments intended for Bay. Bay thus filed another suit in Nueces County against Mendietta alone, seeking damages for all of Mendietta's wrongful conduct, including the unauthorized improvements to the Ben Bolt Ranch. Bay filed both this suit (against Mendietta and Mulvey) and the Nueces County suit (against Mendietta alone) in September 2012.

Six years later, Bay and Mendietta entered into an agreement resolving (1) the Nueces County suit and (2) their claims against each other in this suit. This agreement is the basis for Mulvey's claim to a settlement credit. Because the parties dispute the agreement's character and legal effect, we describe its terms in some detail. Titled, simply, "Agreement," it states:

- An agreed final judgment, "a copy of which is attached hereto and incorporated herein as if fully copied and set forth herein, will be entered" in the Nueces County suit.

- "Mendietta shall pay Bay, Ltd. Seven Hundred Fifty and 00/100 dollars ($750.00) per month toward satisfaction of the Final Judgment in the [Nueces County] lawsuit beginning April 1, 2018, and continuing on the first (1st) day of each month thereafter."

3

- Bay "shall not take any further or other action to collect on said Final Judgment unless Mendietta fails to timely perform the terms of this Agreement."

- Bay and Mendietta agree to nonsuit their claims against each other in the Jim Wells County suit.

- The agreement "represents a bargained for agreement resulting from the negotiation of the parties executing it."

The agreement also states that "[n]othing in this Agreement shall restrict Mendietta from paying any and all amounts owed under the terms of this Agreement."

The agreed final judgment expressly references several injuries to Bay, including Mendietta's improvements to the Ben Bolt Ranch. It states: "Without Bay, Ltd.'s knowledge, consent, or authority, Mendietta received Bay's [sic] Ltd.'s services, materials, equipment, and/or supplies . . . to improve the real property, owned by [Mulvey], more particularly described as 978.60 acres in Jim Wells County." It also makes clear that Mendietta "is not opposing entry of this Final Judgment," and it fixes Bay's award at $1.9 million.

Lastly, the agreed final judgment imposes a "constructive trust and a constitutional lien" on Mendietta's homestead in favor of Bay. With respect to the constructive trust and lien, the agreement provides:

- "If timely made and received, all payments received shall be *first* applied to amounts owed on the constructive trust and constitutional lien . . . . Otherwise, all payments received shall be applied to the *other amounts owed in the Final Judgment*." [Emphases added.]

- Bay "shall release the constructive trust and constitutional lien" on Mendietta's homestead once "the amounts owed on the constructive trust and constitutional lien portion of the Final

4

Judgment are paid and if no other event of default listed above has occurred."

The agreed final judgment further states that, as of the date of its entry, "$175,000.00 of the $1,900,000.00 owed on the Final Judgment relates to" Mendietta's homestead. The agreed final judgment was rendered in the Nueces County suit.

Back in this suit, Bay nonsuited its claims against Mendietta and proceeded to trial against Mulvey alone. The jury was asked whether Mulvey held "benefits or property that were provided to the Ben Bolt ranch that in equity and good conscience" belonged to Bay.[2] It answered "yes" and awarded Bay $458,426.14. In response to Bay's motion for judgment on the verdict, Mulvey requested that the trial court apply a settlement credit in the amount of $1.725 million—the amount of the $1.9 million agreed final judgment less the $175,000 allocated to Bay's damages for improvements to Mendietta's homestead. The trial court denied Mulvey's request and rendered judgment on the jury's verdict.

The court of appeals reversed. It concluded that the agreement and agreed final judgment, which is an exhibit to and incorporated in the agreement, together constitute a settlement for $1.9 million. ___ S.W.3d ___, 2021 WL 2942448, at *3–4 (Tex. App.—San Antonio July 14, 2021). The court also concluded that Bay established that $175,000 had been allocated to Bay's injury resulting from Mendietta's

---

[2] Mulvey contends that this question and its accompanying instructions omitted essential elements of unjust enrichment, incorrectly allowing the jury to answer "yes" merely by finding the receipt of a benefit that rightfully belongs to another without also finding fraud, duress, or the taking of an undue advantage. Because we dispose of the case on other grounds, we express no opinion on this issue. *See infra* note 5.

5

improvements to his homestead but that Bay did not meet its burden to allocate the remaining $1.725 million to any injury other than that for which Bay sought recovery from Mulvey. *Id.* at \*4. Because the unallocated amount of the settlement ($1.725 million) exceeded the amount of the jury's verdict ($458,426.14), the court rendered judgment that Bay take nothing. *Id.* at \*5. Bay petitioned this Court for review.

## II.    Settlement credits and the one-satisfaction rule

Under the common-law one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered. *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 106–07 (Tex. 2018); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury."). "[T]he fundamental consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single, indivisible injury—not the causes of action the plaintiff asserts . . . ." *Sky View*, 555 S.W.3d at 107.

Where a party seeking recovery has previously settled, the one-satisfaction rule manifests itself in the form of a settlement credit. *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993). We apply these credits to prevent windfalls and collusive settlements. *Virlar v. Puente*, 664 S.W.3d 53, 60 (Tex. 2023); *Sky View*, 555 S.W.3d at 107. And we have emphasized that, in applying settlement credits, "a nonsettling party should not be penalized for events over which it has no control." *Utts v. Short*, 81 S.W.3d 822, 829 (Tex. 2002).

The process for adjudicating a defendant's claimed entitlement to a settlement credit is well established. First, a nonsettling defendant

6

seeking a settlement credit "has the burden to prove its right to such a credit." *Sky View*, 555 S.W.3d at 107. The defendant discharges this burden "by introducing into the record either the settlement agreement or some other evidence of the settlement amount." *Id.* Once the nonsettling defendant demonstrates a right to a settlement credit, "the burden shifts to the plaintiff to show that certain amounts should not be credited because of the settlement agreement's allocation." *Id.* (quoting *Utts*, 81 S.W.3d at 828). "The plaintiff can rebut the presumption that the nonsettling defendant is entitled to settlement credits by presenting evidence showing that the settlement proceeds are allocated among defendants, injuries, or damages such that entering judgment on the jury's award would not provide for the plaintiff's double recovery." *Id.* at 107–08. We have said that "[a] written settlement agreement that specifically allocates damages to each cause of action will satisfy this burden." *Id.* at 108. And we have not foreclosed the use of evidence other than a written settlement agreement to prove or dispute allocation.[3] We have made clear, however, that if a plaintiff fails to carry its burden to allocate, then the defendant is entitled to a credit equal to "the entire settlement amount." *Id.*

The principles governing settlement credits thus boil down to this: a nonsettling defendant is presumptively entitled to a credit for the entire amount of a settlement unless the plaintiff proves that part or all

---

[3] In *Utts*, for example, we credited other evidence—collateral settlement agreements, checks, a letter instructing attorneys to distribute settlement funds to nonsettling plaintiffs, and statements of counsel—supporting the defendant's argument that a settlement's express allocation was a sham. 81 S.W.3d at 830.

of the settlement amount is attributable or allocated to an injury other than the one for which it seeks recovery from the nonsettling defendant. *See id.* at 107–08. Calculating the amount of a settlement credit thus will typically entail three questions: (1) Is there a settlement that should be credited against this judgment? (2) If so, what is the amount of that settlement? (3) Did the plaintiff prove that part or all of the settlement amount should not be credited against the verdict because it is attributable or allocated to a separate injury?

We touched on the first of these questions—what makes a settlement—in *MCI Sales & Service, Inc. v. Hinton*, 329 S.W.3d 475 (Tex. 2010). There, we considered whether a bus operator that deposited insurance proceeds with a bankruptcy court—after negotiating with crash victims—was a "settling person" within the meaning of Chapter 33 of the Civil Practice and Remedies Code. *Id.* at 480. The claimants in *Hinton* agreed to an apportionment plan in which a mediator assigned a percentage of the deposited funds to each claimant for approval by the bankruptcy court. *Id.* Each claimant had the opportunity to reject the mediator's allocation and instead try his or her claim to a special judge to seek a higher percentage. *Id.* At a later trial against the bus manufacturer, claimants who tried their claims to the special judge argued there was no settlement and that the bus operator was not a settling person within the meaning of Chapter 33 due to the uncertain and adversarial nature of the process used to determine what funds each would be awarded. *Id.* at 501.

8

Although *Hinton* was a Chapter 33 case, it is nonetheless instructive as to the common question of whether a settlement exists.[4] We said in *Hinton* that there was "no question" that a claimant who received payment or a promise to pay in exchange for a release of liability had settled. *Id.* at 501–02. We rejected the claimants' argument that we should not treat the arrangement as a settlement, holding that a settlement is not contingent where a defendant has made an unconditional promise to pay. *See id.* at 502 (citing *Gilcrease v. Garlock, Inc.*, 211 S.W.3d 448, 455 (Tex. App.—El Paso 2006, no pet.)). We also made clear that substance trumps form: where the "negotiations and terms of an agreement in every way resemble a settlement," "we must define it as what it is—a settlement." *Id.* at 504; *see also C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 320 (Tex. 1994) (referring to a settlement as "money or anything of value paid or promised to a claimant in consideration of potential liability").

Settlement agreements are interpreted like any other contract. *See Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 642 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). So, too, are agreed judgments. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 422 (Tex. 2000) ("An agreed judgment should be construed in the same manner as a contract."). In interpreting these documents, our fundamental

---

[4] We have repeatedly "refer[red] to the common law" where Chapter 33 is silent. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998); *see also First Title*, 860 S.W.2d at 78 (relying on common-law principles for a settlement-credit determination when the relevant statute was silent). Because the terms "'settle' and 'settlement' were not defined in Chapter 33," *Hinton*, 329 S.W.3d at 500, our discussion in that case of what constitutes a settlement was not cabined to or limited by Chapter 33.

9

objective is to ascertain the parties' intent according to their chosen words. *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). We examine the contract as a whole and, to the extent possible, give meaning to every provision. *Id.* Settlement agreements and agreed final judgments, where incorporated by reference, can be considered, as a matter of law, part of a single contract. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 709 (Tex. 2023) (concluding that documents incorporated in a contract are part of the parties' agreement as if set forth within the agreement itself); *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) ("Documents incorporated into a contract by reference become part of that contract."); *Wells v. Wells*, 621 S.W.3d 362, 367 (Tex. App.—Houston [14th Dist.] 2021, no pet.) ("Here, the Settlement Agreement . . . and the Agreed Final Judgment are, as a matter of law, part of a single contract.").

### III.   Analysis

The parties dispute the first two questions in the settlement-credit analysis: is there a settlement that should be credited against the jury's verdict and, if so, in what amount? Bay denies that the agreement constitutes a "settlement" for purposes of the one-satisfaction rule. It argues that the agreement's terms do not obligate Mendietta to pay $1.9 million or any particular amount at all. According to Bay, the agreement is merely a forbearance agreement that requires Mendietta to make monthly $750 payments to avoid foreclosure on his home. But Bay arrives at this conclusion by divorcing the agreement from the agreed final judgment that it expressly incorporates.

10

As a fallback position, Bay asserts that even if the agreement constitutes a $1.9 million settlement, it cannot give rise to a settlement credit in that—or any other—amount. It asserts that the one-satisfaction rule concerns itself only with amounts that have already been paid, so, the argument goes, any future obligation of Mendietta to pay Bay should be ignored. It also suggests that, in any event, Mendietta will never satisfy the agreed final judgment. Bay urges that adopting its position will not result in a windfall to Bay, which is all the one-satisfaction rule seeks to avoid.

We address Bay's arguments in turn.

### A. The agreement and agreed final judgment constitute a settlement agreement.

We first consider whether the agreement and agreed final judgment entered into the record by Mulvey in response to Bay's motion for judgment constitute a settlement agreement. At various points, Bay has argued that its agreement with Mendietta is a mere forbearance agreement. Bay emphasizes it is "merely an agreement to pay $750/month for a separate and distinct injury unique to Mendietta and in exchange for forbearing foreclosure on Mendietta's homestead." Yet Bay does not say why an agreement that requires forbearance by one party cannot also be a settlement agreement. While Bay now concedes that its agreement "is a type of settlement," we would reach the same conclusion without any such concession.

A hallmark of a settlement agreement is that it ends a dispute. *Settlement*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An agreement ending a dispute or lawsuit."). Our cases have said as much. *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860 (Tex. 1999) (observing that

11

settling is "commonly understood as fully resolving" a dispute and "in connection with litigation must be understood as signifying that the controversy had been adjusted and brought to an end" (quoting *Yancey v. Yancey*, 55 S.E.2d 468, 469 (N.C. 1949))).

The agreement between Bay and Mendietta did exactly that. It brought Mendietta and Bay's disputes with one another—both in this case and in the Nueces County suit—to an end. This is evident from its terms. The agreement expressly incorporates the agreed final judgment to be rendered in the Nueces County suit. A final judgment, of course, reflects that all claims between the parties have concluded. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 192 (Tex. 2001) (holding that a judgment is final if it "actually disposes of all claims and parties then before the court"). The agreement further reflects that Bay and Mendietta agreed to nonsuit with prejudice all their claims against each other in this suit. In exchange, Mendietta agreed to pay Bay $750 per month toward satisfaction of the agreed final judgment.

Giving these terms their ordinary and plain meaning, we conclude that the "negotiations and terms of [the] agreement in every way resemble a settlement." *Hinton*, 329 S.W.3d at 504. Bay and Mendietta negotiated mutual nonsuits and releases of certain claims, ended litigation against each other (in two different suits), and created a payment plan by which Mendietta agreed to make monthly payments to Bay.

That Bay and Mendietta included an agreed final judgment as part of their settlement does not alter the analysis. Agreed final judgments are common in settlements, and we have never cast doubt on

12

their use. *See, e.g.*, *Garcia v. Martinez*, 988 S.W.2d 219, 221 (Tex. 1999) (describing a "final agreed judgment" entered after the parties' settlement); *see also Wells*, 621 S.W.3d at 367 ("The Agreed Final Judgment specifically incorporates the Settlement Agreement, and the Settlement Agreement attached, and expressly required Stephen to execute, . . . the Agreed Final Judgment."); *Beckendorff v. City of Hempstead*, 497 S.W.3d 530, 532 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting that the parties effectuated their post-verdict settlement through an agreed final judgment).

In short, the express terms of the agreement yield but one conclusion: Bay and Mendietta agreed to end their disputes against one another in both suits in exchange for a promise by Mendietta to make monthly payments to Bay. Applying a de novo standard of review, we hold that, as a matter of law, they settled. *See Sky View*, 555 S.W.3d at 108 (applying de novo review to the application of a settlement credit); *Hinton*, 329 S.W.3d at 502 (explaining that parties who promise payment in exchange for ending their dispute have settled); *O'Byrne*, 996 S.W.2d at 860 (recognizing that an offer of settlement implies an offer to end a dispute); *C & H Nationwide*, 903 S.W.2d at 320 (defining a settlement to include a promise to pay in consideration of liability).

**B. The amount of the settlement is $1.9 million.**

Having determined that the agreement is a settlement agreement, the *Utts* framework requires we next ascertain its amount. Bay argues that the agreement obligates Mendietta to pay $175,000 in the aggregate, which, at the rate of $750 per month, will take over nineteen years. Because the entire $175,000 is for the injury relating to

13

Mendietta's homestead, Bay argues none of Mendietta's payment obligation may be credited against the jury's verdict against Mulvey, which relates solely to the Ben Bolt Ranch. We disagree with Bay's premise that the agreement requires Mendietta to pay only $175,000. Rather, construing the agreed final judgment and agreement together, as we must, they demonstrate that Mendietta is obligated to pay Bay $1.9 million.

First and foremost, the agreed final judgment incorporated into the agreement fixes Mendietta's total obligation to Bay at $1.9 million. The agreement states that Mendietta is paying $750 per month "toward satisfaction of the Final Judgment." Nothing in the agreement indicates the agreed final judgment will be satisfied—or Mendietta will be released from his monthly payment obligation—once he pays $175,000 in the aggregate. If that were the sum total of Mendietta's obligation, one would expect the parties to have said so. They did not.

Instead, the agreement unambiguously confirms that Mendietta's payment obligation is $1.9 million, which far exceeds the $175,000 value that Bay ascribes to the homestead lien. The agreement requires Mendietta's payments to be applied "*first*" to the lien, meaning that they will be applied to something else once Mendietta's payments exceed $175,000 in the aggregate. Nothing in the agreement can be understood to mean Mendietta's obligations will end once he remits $175,000. While the agreement requires Bay to release the homestead lien at that time, Mendietta's monthly payment obligation continues.

Bay suggested at oral argument that the agreement permits Mendietta to stop making monthly payments after the lien is released.

14

But this assertion finds no support in the agreement's text, and Bay offered no explanation for the parties' decision to fix the value of the agreed final judgment at $1.9 million if their secret, unwritten intent was to cap Mendietta's total obligation at less than ten percent of that amount. To her credit, Bay's counsel conceded at oral argument that if Mendietta stopped making the monthly payments, Bay could sue Mendietta (or his estate) to recover the amount of the final judgment that remained unsatisfied. This confirms, consistent with the agreement's text, that the agreement obligates Mendietta to pay Bay not just the value of the lien but the full $1.9 million fixed in the agreed final judgment. Certainly, Bay could have limited Mendietta's payment obligation under the settlement agreement to the $175,000 value of the homestead lien, but it chose not to. And, tellingly, Bay has never explained why, if Mendietta has no obligation to pay Bay $1.9 million, that amount is recited in the agreed final judgment. Rather than explain its inclusion, Bay proclaims the final judgment is not part of the agreement.

Determining the extent of Mendietta's obligation is critical because, as we have emphasized, it is the "amount" of the settlement that is credited—not merely what payments a settling party has already received or speculates it may realize under a payment structure it negotiated. *Sky View*, 555 S.W.3d at 108. Bay would have us treat the settlement as having only the value of the payments that Mendietta has made thus far, even though future payments are required every month. We decline to do so because a settlement includes "money or anything of

15

value *paid or promised* to a claimant in consideration of potential liability." *C & H Nationwide*, 903 S.W.2d at 320 (emphasis added).

Bay suggests that our previous use of the word "proceeds" in our settlement-credit cases supports limiting the amount of a credit to the value of payments the plaintiff has received as of the time of the verdict. *See Sky View*, 555 S.W.3d at 107 ("The plaintiff can rebut the presumption that the nonsettling defendant is entitled to settlement credits by presenting evidence showing that the settlement proceeds are allocated . . . ."); *Utts*, 81 S.W.3d at 830 (concluding that each plaintiff's recovery "should be credited with the amount reflecting the benefit he or she received from the settlement proceeds"). But those cases do not support Bay's argument. Both *Utts* and *Sky View* involved settlements that had already been fully paid. In such a case, it makes sense that the credit would equal the amount of proceeds a plaintiff had realized. Because the settlements at issue in *Utts* and *Sky View* did not require future payments, they do not support excluding from the settlement-credit analysis amounts the plaintiff has a contractual right to receive in the future merely because the future obligation remains unsatisfied. *See Nat'l Oil Well Varco, L.P. v. Sadagopan*, No. H-16-2261, 2018 WL 5778250, at *4 (S.D. Tex. Oct. 31, 2018) (recognizing that *Utts* and *Sky View* are not so narrow as to preclude credit for promised future payments).

To bolster its argument that unsatisfied obligations should be excluded from the settlement-credit analysis, Bay also relies on cases holding that an unsatisfied judgment does not bar a successive suit. *See, e.g., Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 112 (Tex.

16

App.—Houston [1st Dist.] 2012, pet. denied) (concluding that because "it is the *satisfaction* of a judgment, not the *obtaining* of a judgment, that bars further suits," the one-satisfaction rule did not preclude successive suits where there has been no satisfaction); *Daryapayma v. Park*, No. 02-15-00159-CV, 2016 WL 6519117, at *3 (Tex. App.—Fort Worth Nov. 3, 2016, no pet.) (holding that an unsatisfied default judgment was not a bar to rendition of a subsequent judgment against co-defendants). But those cases do not control because they involved unsatisfied judgments rendered after full adversarial adjudication of claims, not by the parties' agreement as happened here. In those cases, the one-satisfaction rule did not come into play because, unlike here, the plaintiff had not been paid anything and, indeed, no one had promised to pay the plaintiff anything. There was neither satisfaction nor a promise of satisfaction.

Bay complains that applying a $1.9 million settlement credit is unjust because it likely will realize only a small fraction of that amount. But the risk that a settling defendant may not perform exists in virtually any settlement arrangement and is only magnified by the protracted monthly payment plan the parties employed here. Excluding from the settlement-credit analysis Mendietta's obligation to make future payments would complicate the work of trial courts applying settlement credits and invite windfalls and collusive settlements the one-satisfaction rule seeks to avoid. *See Utts*, 81 S.W.3d at 830 (rejecting the plaintiffs' attempt to avoid a settlement credit through collusive collateral agreements); *First Title*, 860 S.W.2d at 78 (noting that credits are necessary to avoid windfalls); *see also Virlar*, 664 S.W.3d

17

at 60 (explaining that settlement-credit schemes prevent collusive settlements). By contrast, the rule that the full amount of a settlement is eligible to be credited, regardless of the payment's timing, affords clarity, enables parties to know the consequences and effects of settling at the time of contracting, and incentivizes reasonable, prudent settlements. *See Hinton*, 329 S.W.3d at 504 (explaining that "[o]ur holding will also have no adverse effect on parties . . . in settlement negotiations" because parties who "enter into an agreement that in all respects resembles a settlement" will have certainty as to the consequences of their agreement). The plain terms of their writing demonstrate Mendietta is obligated to pay Bay $1.9 million in connection with their settlement—Bay's agreement to accept a protracted payment schedule does not permit a reduction of that amount.

### C. Bay allocated only $175,000 to injuries other than the one for which it sued Mulvey.

Once a defendant proves the amount of a settlement agreement, the plaintiff, to avoid a credit in the full amount of the settlement, bears the burden to allocate part or all of the settlement's value to an injury or damages different from the one for which it seeks recovery against the defendant. *Sky View*, 555 S.W.3d at 111–12.

Bay does not challenge the court of appeals' conclusion that $1.725 million of the settlement agreement was unallocated—nor could it. The agreed final judgment explicitly states that Bay sought recovery from Mendietta for his unauthorized improvements to the Ben Bolt Ranch—the same injury for which it sought recovery against Mulvey. While the agreed final judgment references multiple other injuries,

18

neither the agreement nor the agreed final judgment allocates any value to the injury Bay suffered in connection with the ranch. Indeed, the agreement allocates a value to only one of the many injuries Mendietta inflicted upon Bay: it states that "$175,000.00 of the $1,900,000.00 owed on the Final Judgment relates to" Mendietta's homestead.

Bay offered no evidence allocating its $1.9 million settlement among the remaining injuries referenced in the agreement and final judgment. There is thus no evidence supporting any particular allocation of value to the injury Bay suffered in connection with the improvements at the Ben Bolt Ranch. In the absence of such evidence, our precedents require the entire remaining unallocated settlement amount—$1.725 million—to be credited against the jury's verdict. *See id.* at 108 ("If the plaintiff fails to satisfy this burden, then the defendant is entitled to a credit equal to the entire settlement amount.").[5]

## IV. Conclusion

Bay settled its claims against Mendietta in exchange for Mendietta's promise to pay Bay $1.9 million. That settlement covered several injuries that Mendietta inflicted upon Bay, including the injury for which Bay sued Mulvey in this suit. Having established the existence and amount of the settlement, Mulvey was entitled to a settlement credit for the full amount unless Bay proved the agreement allocated value to injuries or claims other than Bay's claim regarding unauthorized improvements to the ranch. Bay carried that burden only

---

[5] Mulvey also contends there was error in the jury charge regarding both the essential elements of liability and the proper measure of damages, and he challenges the award of attorney's fees. Because the settlement-credit issue is dispositive, we express no opinion on any other issue.

insofar as the evidence supported the conclusion that $175,000 was allocated for improvements to Mendietta's homestead. Bay failed to prove the remaining $1.725 million was allocated to something other than damages related to the ranch. Our precedents require that the unallocated amount—$1.725 million—be credited against the jury's verdict. Accordingly, we affirm the court of appeals' take-nothing judgment.

Rebeca A. Huddle
Justice

**OPINION DELIVERED:** March 1, 2024

20