TRI-LEGENDS CORPORATION, Appellant,

v.

TICOR TITLE INSURANCE COMPANY OF CALIFORNIA and Ticor Title Insurance Company, Appellees.

No. A14-93-00946-CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 22, 1994.

Rehearing Overruled Oct. 20, 1994.

Leonard H. Simon, Timothy J. Henderson, Todd J. Zucker, Houston, Philip K. Maxwell, Joe K. Longley, Austin, for appellant.

Thomas T. Hutcheson, Mary Jo Cantu, Houston, William V. Dorsaneo, III, Dallas, for appellees.

Before J. CURTISS BROWN, C.J., and MURPHY and ELLIS, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

Tri–Legends Corporation (Tri–Legends) brought suit against Ticor Title Insurance Company of California (Ticor–California) and Ticor Title Insurance Company (Ticor), appellees, alleging that appellees, in a title commitment, misrepresented the state of the title to property in Galveston County, Texas. The trial court granted summary judgment in favor of the appellees. We affirm.

On April 23, 1987, Tri–Legends entered into an earnest money contract with Allied Bank (Allied) to purchase from Allied a marina and condominium development that comprised approximately seventeen (17) acres. The development was called Legend Point. The purchase price was $9,750,000.00. Allied had foreclosed on the property pursuant to promissory notes secured by deeds of trust executed in 1983. Allied came by the property when in July of 1986, a foreclosure sale was held. Allied purchased Legend Point at the sale. The earnest money contract between Tri–Legends and Allied named Ticor, an agent for Ticor–California, as the "Title Company" and provided that Ticor would issue an Owner's Title Policy Commitment setting forth the state of the title to Legend Point.

On April 24, 1987, Thomas Brennan, the Allied officer in charge of selling the property, delivered to Paul McNutt, an agent for appellees, the earnest money contract and Tri–Legends' earnest money check. On May 7, 1987, Ticor delivered the title commitment to Brennan. Brennan delivered the title commitment to Tri–Legends. The commitment, dated April 11, 1987, stated that the proposed insured was Bankers Capital Management, Inc., Trustee, rather than Tri–Legends. However, Brennan's affidavit and the exhibits attached thereto, make it clear that the commitment was being issued for the Allied/Tri–Legends sale. The commitment stated that record title to Legend Point "appears to be vested in ALLIED BANK OF TEXAS."

Allied conveyed the property to Tri–Legends by Special Warranty Deed dated June 30, 1987. The deed was recorded on July 8, 1987. Approximately three weeks after the closing, Tri–Legends began preparing to sell some of the condominium units. In preparation for the sale, Tri–Legends sought a title commitment from Commonwealth Title (Commonwealth). The title commitment prepared by Commonwealth showed that title to the condominium tract, a 4.58 acre tract, was not in Allied, but was vested in Russell King Development Corporation (RKDC).

On February 25, 1988, Tri–Legends brought suit against appellees based on the alleged misrepresentation in the title commitment claiming, among other things, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act (DTPA), negligence, negligent misrepresentation, and breach of the duty of good faith and fair dealing. Appellees moved for summary judgment on several grounds. The trial court, without stating the ground or grounds relied on, granted summary judgment in favor of appellees. Tri–Legends appeals from the judgment.

 Tri–Legends raises several arguments on appeal. All of them challenge the trial court's granting of summary judgment in favor of appellees.[1] In a review of a summary judgment, the issue on appeal is whether the movant met its burden by estab-

---

1. Tri–Legends has only one formal point of error. It states that the trial court erred in granting summary judgment in favor of the appellees. Under this point of error, Tri–Legends makes numerous arguments.

lishing that there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Cooke v. Maxam Tool and Supply, Inc.*, 854 S.W.2d 136, 139 (Tex.App.—Houston [14th Dist.] 1993, writ denied); TEX. R.CIV.P. 166a. In deciding whether there are any disputed material fact issues precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Tenneco Oil v. Gulsby Eng'g*, 846 S.W.2d 599, 603 (Tex.App.—Houston [14th Dist.] 1993, writ denied). Every reasonable inference will be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.* When the trial court does not state the reasons for granting the summary judgment in its order, we will affirm the summary judgment if any of the theories advanced in the motion are meritorious. *Jobs Bldg. Servs., Inc. v. Rom, Inc.*, 846 S.W.2d 867, 869 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

■ The basis for all of Tri–Legends' claims against appellees is Tri–Legends' contention that appellees misrepresented who "record title" to the 4.58 acre tract "appeared to be in" when Ticor issued its title policy commitment. In their motion for summary judgment, appellees alleged that they were entitled to judgment as a matter of law because "record title" to the 4.58 acre tract did appear in Allied, as stated in the title commitment, and thus, there was no actionable misrepresentation.

Both appellant and appellees argue that a construction of the phrase "record title" as used in a title commitment form is the critical issue in this appeal. Tri–Legends argues that "record title" means "a series of instruments from 'sovereignty of the soil' to the present, shown or referred to in the appropriate county clerk land records." *See* 71 H.

Kendrick & J. Kendrick, TEXAS TRANSACTION GUIDE para. 78A.20, 78A–17 (1993). Appellees contend that the "record title" holder is the "last named grantee shown in the last deed to the property appearing in the chain of title to the property." We find that it is unnecessary under the facts of this case to determine which, if either, definition is correct under Texas law. The summary judgment proof in the record before us conclusively establishes that on the day the title commitment was issued by appellees, "record title appeared to be in Allied," under either definition of record title.[2]

In July of 1982, Curtis and Pauline Redman, Fred and Marian Waddell, and Thomas Brannon, Jr. each sold two tracts of land comprising over twenty-one acres to Russell King, trustee.[3] No beneficiaries were listed in these deeds. Each seller kept a vendor's lien on the tracts sold to King, trustee. In October of the same year, Legend Point Limited (LPL), a limited partnership in the business of land development, executed a promissory note to Allied for $2,620,000. Along with the note, LPL executed a deed of trust and a security agreement covering the twenty-one acres purchased by Russell King, trustee. The deed of trust and the security agreement were executed to secure the promissory note. Each of these documents, the note, the deed of trust, and the security agreement, was signed by Russell King as general managing partner for LPL. The original sellers, the Redmans, the Waddells, and Brannon, agreed to subordinate their liens to Allied's deed of trust. In August of 1983, a second promissory note for $2,860,000 was executed by LPL to Allied as a renewal and extension of the 1982 note. A second deed of trust and security agreement was also executed to secure the renewal note. These documents were also signed by Russell

2. We also wish to note our belief that both sides make more of an issue of the phrase "record title" than it deserves. The statutory definition of "title" is "a regular chain of transfers of real property from or under the sovereignty of the soil." TEX.CIV.PRAC. & REM CODE ANN. § 16.021(4) (Vernon 1986). Thus, the record title holder of a piece of property is simply the person or entity who holds "title" according to the property records at the time the search is made.

3. Neither appellant or appellees contend that these original grantors, the Redmans, the Waddells, and Brannon, did not have title to the land sold to King, trustee. Thus, the title from "the sovereignty of the soil" to these grantors is presumed, for the purposes of this appeal, to be good title.

King as general managing partner for LPL. All of the documents were recorded.

On January 1, 1985, Russell King, trustee, deeded approximately thirteen of the twenty-one acres to LPL. This land included a marina and unimproved acreage. This deed was recorded in May. On the same day, King, trustee, deeded 4.58 acres of the twenty-one to the Russell King Development Corporation (RKDC), a corporation in which he served as president. This land contained two condominium structures. This deed, which was also recorded in May, stated that the conveyance to RKDC was expressly subject to all liens and encumbrances of record.

In 1986, LPL defaulted on its obligations to Allied. At this time, both LPL and RKDC were in bankruptcy court after having declared Chapter 11 bankruptcy. Knowing this, Allied went to the bankruptcy court and on May 16, 1986, filed a motion asking that the automatic bankruptcy stay be modified so that Allied could foreclose on the property under the two deeds of trust. The bankruptcy court, without objection from LPL **or RKDC**, granted Allied's motion and modified the stay. As a result of the default and with the permission of the bankruptcy court, Allied, in July of 1986, executed and filed two substitute trustee's deeds whereby Allied foreclosed and took title to the land secured by the deeds of trust and security agreements executed by LPL and signed by King. As we stated earlier, Allied bought the property at the foreclosure sale and in 1987 sold approximately 17 acres of it, including the 4.58 acre condominium tract, to Tri–Legends. Appellees prepared the title commitment showing title in Allied. After Tri–Legends closed its deal with Allied, it attempted to sell one of the condominium units and sought a title commitment from Commonwealth. Commonwealth reported to Tri–Legends that title was apparently vested in RKDC.

In support of its claim that Allied did hold title to the property in question, i.e., there was no actionable misrepresentation, appellees offered the affidavit of Richard Coselli, an attorney board certified as a specialist in commercial real estate. Attached to the Coselli affidavit are copies of all of the documents referred to above. These documents show that as a matter of law, Allied had title to the 4.58 acre tract when it was sold to Tri–Legends.

First, the record establishes that Allied's claim is superior to that of the Redmans, Waddells, and Brannon, immediate predecessors in title to King, trustee. These parties expressly agreed to subordinate their retained vendors' liens to the note and deed of trust lien executed by LPL in favor of Allied on October 20, 1982. Because Russell King signed the LPL notes and deeds of trust as managing general partner of LPL, he was well aware that LPL was using the entire acreage to secure the notes and that the vendors' liens were being subordinated to facilitate that arrangement and allow LPL to secure its financing.

Second, when King, trustee, deeded the 4.58 acre tract to RKDC, the general warranty deed specifically stated as follows:

THIS CONVEYANCE IS EXPRESSLY MADE *SUBJECT TO*, AND NOT IN ASSUMPTION OF, ALL LIENS AND ENCUMBRANCES OF RECORD IN THE OFFICE OF THE COUNTY CLERK OF GALVESTON COUNTY, TEXAS, and is also subject to all restrictions, reservations, covenants, easements and rights of way validly of record in the office of the county clerk of Galveston County, Texas. Ad valorum [sic] taxes have been paid by the Grantor for 1982, and Grantee agrees to pay ad valorum [sic] taxes due for 1983 and subsequent years, not yet due and payable.

This transaction took place on January 1, 1985, over two years after the first LPL note was executed and the deed of trust filed of record, and almost a year and a half after the second LPL note was executed and the deed of trust filed. Because King himself signed the LPL notes as managing partner and was the grantor in the sale to RKDC, his own corporation, it is clear that Allied's liens on the property that was originally sold to King, trustee, were to remain superior to any claim on the property by RKDC. The so-called competing record title holder, RKDC, received a deed executed by King, trustee, which provided that its claim to the property would be subject to all previous encum-

brances of record. This was obviously done with full knowledge of the existence of the Allied liens since King was the one who signed the Allied notes and sold the property to RKDC. Therefore, Allied's liens were superior, and could be foreclosed on, by virtue of the very language in the deed relied on by the RKDC.

Third, Allied sought and obtained express permission from the LPL and RKDC bankruptcy court to foreclose its liens on the property, including the 4.58 acre tract. An Agreed Order Lifting Stay was filed of record in the bankruptcy proceedings and there was never any protest or ownership claim asserted by RKDC.[4] Thus, when Allied foreclosed the deed of trust liens on July 1, 1986, it became the sole title holder of the 4.58 acre tract and remained the owner on the date that appellees stated in the commitment that "record title" appeared to be in Allied.

Finally, the record reflects that on November 3, 1987, Russell King executed an "Affidavit Acknowledging Trust." In that document, King admitted that when he purchased the six tracts of land from the Redmans, the Waddells, and Brannon as trustee, he did it for the benefit of LPL. In other words, LPL was the beneficiary of the purchase and as such was entitled to execute the notes to Allied and put up the land sold to King, trustee, as collateral. This document relates back to the original date of purchase by King, trustee, and fills in the missing beneficiary.

The effect of all of these documents shows that as a matter of law Allied had title to the 4.58 acre tract and thus, appellees did not misrepresent the state of the title in the title commitment.

Tri–Legends argues that even if there was no misrepresentation, its claims under § 17.45(5) of the DTPA still survive because the cause of action does not require a misrepresentation, it simply requires an "unconscionable action or course of action." The Act defines "unconscionable action or course of action" as conduct that takes advantage of a person's lack of knowledge, ability, experience, or capacity to a grossly unfair degree or which results in a gross disparity between the value received and the consideration paid. TEX.BUS. & COM.CODE ANN. § 17.45(5)(A) & (B) (Vernon 1987).

In support of its argument, Tri–Legends cites *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532 (Tex.App.—Corpus Christi 1989, no writ) and the cases cited therein. In that case, the appellate court held that a consumer may maintain a cause of action when any unconscionable action is the producing cause of damages. *Id.* at 538. The court also stated that a finding of unconscionable conduct was possible even in the absence of a specific misrepresentation. *Id.* However, in order to give rise to a claim under this section of the DTPA, the conduct must still be unconscionable as defined under the Act. *See id.*

After reviewing all of the relevant summary judgment proof in the light most favorable to Tri–Legends, it is clear that not only was there no misrepresentation, as we stated above, but that appellees' conduct was far from unconscionable. Tri–Legends has claimed all along that its problems stemmed from the fact that it was induced to purchase the property from Allied by the representation in the title commitment that Allied held record title. Allied did hold record title and Tri–Legends got exactly what it paid for. Therefore, there was no conduct undertaken by appellees which resulted in a "gross disparity" between the amount Tri–Legends paid for the land and the value of the land because it got title to the property from the record title holder.

Further, we find that if anyone tried to take advantage "to a grossly unfair degree" in this case it was Tri–Legends. There was never any challenge to the title of the 4.58 acre tract until three years after the title commitment. When a claim was made by the RKDC bankruptcy trustee, appellees suc-

---

4. The RKDC trustee never asserted a claim against the 4.58 acre tract until June 11, 1990. This was over three years after appellees issued the title commitment stating that Allied appeared to hold title to the property. Further, the record reflects that appellees successfully defended Tri–Legends' title against the trustee despite a lack of cooperation by Tri–Legends and its efforts to disclaim title.

cessfully defended Tri–Legends' title. This defense was successful in spite of Tri–Legends' lack of cooperation, hostility, and repeated attempts to **disclaim** title. There was no unconscionable conduct or course of conduct undertaken by appellees in this case.

■ Tri–Legends also contends that its claims under article 21.21 of the Texas Insurance Code are still viable without a misrepresentation by appellees. In its Fourth Amended Petition, Tri–Legends alleged causes of action under article 21.21, sections 4 and 16. These claims are based on alleged violations of the DTPA and orders promulgated by the State Board of Insurance.

■ To have a cause of action under article 21.21, section 16, the practice alleged to have been unfair must be declared unfair or deceptive acts or practices in the business of insurance in section 4 of article 21.21, the rules and regulations of the State Board of Insurance adopted under article 21.21, or be defined as unlawful deceptive trade practices in section 17.46 of the DTPA. *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 147 (Tex. 1994); *see* TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp.1994).[5]

### ARTICLE 21.21, SECTION 4

■ Section 4 of article 21.21 defines practices that constitute "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." TEX. INS.CODE ANN. art. 21.21, § 4 (Vernon Supp. 1994). Unlike section 17.46 of the DTPA, section 4 does not use the phrase "includes, but is not limited to" in defining prohibited acts. Therefore, article 21.21, section 4 is an exclusive list of actionable statutory unfair or deceptive acts or practices in the business of insurance. *Watson*, 876 S.W.2d at 147. Section 4 does not define a misrepresentation in a title commitment as an unfair or deceptive act or practice, nor does it define any of the

other acts alleged by Tri–Legends as unfair or deceptive. *See* TEX.INS.CODE ANN. art. 21.21, § 4(1)–(9) (Vernon Supp.1994). Thus, the 21.21 claims alleged by Tri–Legends against appellees are not actionable, as a matter of law, through section 4 of article 21.21. *See Watson*, 876 S.W.2d at 147.

### REGULATIONS OF THE STATE BOARD OF INSURANCE

■ Tri–Legends also claims that it is entitled to relief under article 21.21 through Board Order 37550, now 28 TEX.ADMIN.CODE § 21.112, and Board Order 41060, now 28 TEX.ADMIN.CODE § 21.3(a). Section 21.112 states:

> Failure to abide by §§ 21.101–21.122 of this title (relating to Insurance Advertising and Certain Trade Practices, and Solicitation) is prohibited. **An omission of information, false implication, or impression which is misleading or deceptive or had the tendency or capacity to be misleading or deceptive is prohibited.** The requirements of these sections apply to either or both insurers and agents irrespective of whether acts or practices are performed directly or indirectly the insurers or agents or in conjunction with or through non-insurers or non-agents.

28 TEX.ADMIN.CODE § 21.112. (emphasis added)

Though counsel for Tri–Legends only cited the highlighted portion of the provision, it is clear that when the entire section is read and taken in context with the sections 21.101–21.122, that it relates only to deception in insurance advertising. The provisions of the chapter and section 21.112 specifically apply to misrepresentations insurance advertising. The chapter and its subsections do not apply to representations in insurance title commitments. Therefore, this section cannot form a basis for Tri–Legends' article 21.21 claim.

---

5. Article 21.21, section 16 reads:
(a) Any person who has sustained actual damages as a result of another's engaging in an act or practice declared in Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in
any practice defined by section 17.46 of the Business & Commerce Code, as amended, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices.
TEX.INS.CODE ANN. art. 21.21, § 16 (Vernon Supp. 1994).

■ Tri–Legends also relied on section 21.3(a) which states:

(a) Misrepresentation of insurance policies, unfair competition, and unfair practices by insurers, agents, and other connected persons are prohibited by Article 21.20 and Article 21.21 or by other provisions of the Insurance Code and by these sections of the State Board of Insurance. No person shall engage in this state in any trade practice that is a misrepresentation of an insurance policy, that is an unfair method of competition, or that is an unfair or deceptive act or practice as defined by the provisions of the Insurance Code or as defined by these sections and other rules and regulations of the State Board of Insurance authorized by the Code.

28 Tex.Admin.Code § 21.3(a).

This section, like article 21.21 itself, merely prohibits insurers from engaging in unfair or deceptive acts or practices **as defined elsewhere,** e.g., the Insurance Code or Board rules and regulations. Thus, section 21.3(a) does not create a cause of action itself; it is not a separate prohibition of any specific conduct. A claimant would have to rely on the Insurance Code or another Board order for its cause of action.[6]

### SECTION 17.46 OF THE DTPA

■ Tri–Legends next contends that it is entitled to relief under article 21.21, section 16 through section 17.46 of the DTPA. Article 21.21, section 16 provides a private cause of action for any practice **defined by** section 17.46 of the DTPA as an unlawful deceptive trade practice. *Watson,* 876 S.W.2d at 149 (emphasis in the original): Tex.Ins.Code Ann. art. 21.21, § 16 (Vernon Supp.1994). A misrepresentation in a title commitment is not among the enumerated items defined by section 17.46 as an unlawful deceptive trade practice. While section 17.46 is not a complete list of deceptive acts for purposes of the DTPA, *see* Tex.Bus. & Com. Code Ann. § 17.46(b) (Vernon Supp.1994), article 21.21 specifically makes actionable only those acts or practices that are defined

in section 17.46. *Watson,* 876 S.W.2d at 149 (citing *Spradling v. Williams,* 566 S.W.2d 561, 564 (Tex.1978)).

■ Though Tri–Legends pled, in its Fourth Amended Petition, that appellees had violated some of the specific acts or practices listed in 17.46, these allegations were merely a semantical recharacterization of the only true claim in this case, i.e, that appellees had misrepresented who held record title to the 4.58 acre tract, a claim that is not actionable. Further, the provisions of 17.46(b) pled by Tri–Legends to support its article 21.21 claim, (5), (7), and (19), apply to "good or services" which are purchased or leased. The summary judgment proof, even when viewed in the light most favorable to Tri–Legends, conclusively shows that the title commitment was not purchased or leased by anyone; it was issued to Allied without charge. A service that is performed gratuitously is not purchased or leased within the meaning of the DTPA. *Fortner v. Fannin Bank in Windom,* 634 S.W.2d 74, 76 (Tex. App.—Austin 1982, no writ); *Hall v. Bean,* 582 S.W.2d 263, 265 (Tex.Civ.App.—Beaumont 1979, no writ) (holding that when no consideration given for contest prize, there is no "purchase" under DTPA).

■ Tri–Legends' next argument concerns its breach of warranty claim under section 17.50(a)(2) of the DTPA. Tri–Legends alleges that appellees breached its implied warranty that its services were performed in a good and workmanlike manner. We have reviewed Tri–Legends' Fourth Amended Petition and have found that it did not plead this cause of action. In regard to this claim we found the following in the petition:

... Defendants issued the Title Commitment in which the Defendants represented and **warranted** on Schedule A thereto that record title to the Property, including the 4.58 Acre Condominium Tract, was vested in Allied Bank of Texas, when at the time record title to a portion of the Property,

---

6. In its brief, counsel for Tri–Legends miscited section 21.4 as 21.3(a). Section 21.4 does not help Tri–Legends either because it merely defines "misrepresentation," it does not create a cause of action.

the 4.58 Acre Condominium Tract, was in Russell King Developments Corporation. (emphasis added)

This is not a claim for failure to perform services in a good and workmanlike manner. *See generally Melody Home Manufacturing Co. v. Barnes,* 741 S.W.2d 349 (Tex.1987). Thus, appellees were not required to respond in their Motion for Summary Judgment to the *Melody Home* claim because it was not pled.

 Finally, the trial court also properly granted summary judgment to appellees on Tri–Legends' remaining claims, i.e., negligent misrepresentation, breach of the duty of good faith and fair dealing, and negligent failure to cure. The elements of a cause of action for negligent misrepresentation are: (1) the representation is made by the defendant in the course of its business or in a transaction in which it had a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Southwestern Clinic of Bone & Joint Diseases v. Farmers Ins. Group,* 850 S.W.2d 750, 753 (Tex.App.—Corpus Christi 1993, no writ); *First Interstate Bank of Texas, N.A. v. S.B.F.I., Inc.,* 830 S.W.2d 239, 245 (Tex.App.—Dallas 1992, no writ); RESTATEMENT (SECOND) OF TORTS § 552(1) (1977). Appellees negated the second element as a matter of law. They did not supply false information to Tri–Legends. As we stated above, appellees correctly stated that Allied held record title to the property. Because there was no misrepresentation, this claim by Tri–Legends fails as a matter of law.

 Tri–Legends also claimed that appellees breached their duty of good faith and fair dealing. A cause of action for breach of the duty of good faith and fair dealing arises when there is no reasonable basis for denial of a claim, a delay in payment, or a failure on the part of the insurer to determine whether there is any reasonable basis for denial or delay. *Martinka v. Com-*

*monwealth Land Title Ins. Co.,* 836 S.W.2d 773, 776 (Tex.App.—Houston [1st Dist.] 1992, writ denied) (citing *Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987)). In the context of title insurance, a title insurance company is allowed to defend a suit brought by an adverse claimant before having to pay the insured. *Id.* (citing *Southern Title Guar. Co. v. Prendergast,* 494 S.W.2d 154, 156 (Tex.1973)). In this case, appellees never denied any claim by Tri–Legends or refused to defend the title. To the contrary, it is uncontested that appellees successfully defended Tri–Legends' title against the RKDC bankruptcy trustee's adverse claim. Thus, appellees were never obligated to pay a claim by Tri–Legends and Tri–Legends, therefore, has no claim for bad faith.

 Tri–Legends next alleges that appellees were not entitled to summary judgment as to its negligent failure to cure cause of action. In our discussion concerning whether appellees had misrepresented who held record title in the title commitment, we pointed to numerous documents showing that Allied did in fact have record title on the date appellees issued the title commitment. One of those documents was the Affidavit Acknowledging Trust of Russell King, wherein King admitted that he bought the all twenty-one acres of the property as trustee for the benefit of LPL. This document was procured and filed by appellees when Tri–Legends raised concerns about the title. In its negligent failure to cure claim, Tri–Legends asserts that appellees did not investigate whether the affidavit was sufficient to cure title. We hold that whether appellees investigated is irrelevant in that the affidavit, along with the other documents, were in fact sufficient to give Tri–Legends title. This was proven when appellees successfully defended the title. Thus, Tri–Legends has no claim for negligent failure to cure.

Because appellees disproved at least one element of every cause of action alleged by Tri–Legends, they were entitled to judgment as a matter of law. Thus, the trial court correctly granted summary judgment in favor of Ticor and Ticor–California.

■ Notwithstanding the above, there are other grounds sufficient to affirm the trial court's order granting summary judgment in favor of appellees. In their motion for summary judgment, appellees alleged that even if there were a title defect, Tri–Legends could not recover the damages it sought from appellees. On appeal, Tri–Legends challenges this argument.

In its Fourth Amended Petition, Tri–Legends alleged numerous causes of action, e.g., violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act, negligent failure to cure, breach of the duty of good faith and fair dealing, and negligent misrepresentation. As to damages Tri–Legends stated:

> 27. Plaintiff [Tri–Legends] has "incurred actual damages in the amount of at least $17,000,000.00." These damages constitute the lost profits Plaintiff has incurred in this case. In the alternative, Plaintiff requests actual damages in the amount of at least $10,000,000.00, the value of the 4.58 Acre Condominium Tract as of June 30, 1987.

■ Tri–Legends is not entitled to recover the damages it seeks for two reasons. First, as the Texas Supreme Court recently stated in *Chicago Title Ins. Co. v. McDaniel,* 875 S.W.2d 310, 311 (Tex.1994), a title insurance policy is a contract of indemnity. The only duty imposed by a title insurance policy is the duty to indemnify the insured against losses caused by defects in title. *Id.* (citing *Martinka v. Commonwealth Land Title Ins. Co.,* 836 S.W.2d 773, 777 (Tex.App.—Houston [1st Dist.] 1992, writ denied); and *Stewart Title Guar. Co. v. Cheatham,* 764 S.W.2d 315, 320–21 (Tex.App.—Texarkana 1988, writ denied)).

In *McDaniel,* Jerry and Christina McDaniel (the McDaniels) purchased a home from Couch Mortgage Company (Couch) in September of 1983. *Id.* at 310. At the time of the closing, the McDaniels also purchased a title insurance policy to be issued by Chicago Title Insurance Company (Chicago Title). *Id.* The policy provided, in part, that Chicago Title "for value does hereby guarantee to the insured ... good and indefeasible title to

the estate or interest in the land described or referred to in this policy." *Id.*

In December of 1988, the McDaniels were notified by the bankruptcy trustee for Couch that their property was subject to a preexisting lien that had been filed and recorded in April of 1983. *Id.* The McDaniels abandoned the property in October, 1989. *Id.* Three months later, a federal bankruptcy court ruled that the McDaniels' purchase money lien on the property was superior to the preexisting lien. *Id.* Nevertheless, the McDaniels brought suit against Chicago Title claiming violations of the DTPA based on the company's representations in the title policy. *Id.* In April of 1991, Chicago Title secured the release of the 1983 lien. *Id.*

In affirming summary judgment for Chicago Title, the Texas Supreme Court held that because the only duty imposed by a title insurance policy is the duty to indemnify against losses caused by title defects, the issuance of the policy did not constitute a representation regarding the status of the property's title. *Id.* at 311. Rather, a title insurance policy is only an agreement to indemnify if there are any losses caused by any defects. *Id.*

■ Though Tri–Legends did not sue under the title insurance policy itself, instead relying on the title commitment, we see no reason to distinguish *McDaniel* on that basis when a title commitment, in fact, is nothing more than a document used by a title insurance company as a precursor to the issuance of the title insurance policy itself. The information in a title commitment is only relevant to whether the title company will bear the risk of defending the title. *3Z Corp. v. Stewart Title Guar. Co.,* 851 S.W.2d 933, 937 (Tex.App.—Beaumont 1993, writ denied).

Tri–Legends' claims against appellees must fail based on the court's holding in *McDaniel.* The only duty imposed on appellees was the duty to indemnify Tri–Legends against losses caused by defects in title. *McDaniel,* 875 S.W.2d at 311. First, there was no title defect and second, appellees successfully defended Tri–Legends' title when the RKDC bankruptcy trustee tried to contest it. Thus, the trial court correctly

granted summary judgment in favor of appellees.

██ Further, this case is distinguishable from *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74 (Tex.1993), wherein the Texas Supreme Court held a title insurance company was liable for violations of the DTPA based on statements in a title commitment. *Id.* at 76–77. That holding was based on the fact that the title commitment contained an affirmative representation that there were no restrictive covenants of record. *Id.* at 76. It was later determined that a restrictive covenant did exist. The court stated that when an affirmative representation is made, the law imposes a duty to know whether the statement is true. *Id.* If the affirmative statement is false, it is actionable. *Id.* (emphasis added)

First, there were no affirmative representations in the title commitment in this case as there were in *Garrett*. The court's holding in *McDaniel* specifically mentioned *Garrett*, and distinguished it on the grounds that the McDaniels' title insurance policy did not contain any affirmative representations. *See McDaniel*, 875 S.W.2d at 311 n. 1. The statement that "record title appeared to be vested in Allied" is analogous to the statement contained in the title insurance policy in the *McDaniel* case. *Id.* at 310. The McDaniels' policy stated that "... the Insured has good and indefeasible title to the estate or interest in the land described or referred to in this policy." *Id.* The court did not consider this an actionable affirmative representation. Thus, based on this holding, we do not consider the statement "record title appears to be vested in Allied," to be an actionable representation. Further, unlike *Garrett*, there were no representations in the case that turned out to be false. At the time the commitment was issued, Allied did have title to the property.

██ Tri–Legends is also not entitled to recover from appellees because the damages sought by Tri–Legends were caused not by any action or inaction on the part of appellees, but because of its own actions. Tri–Legends initially claimed it was damaged because it lost nine earnest money contracts when the "title glitch" surfaced. This is inaccurate. The summary judgment proof affirmatively establishes that the contracts were not lost because of any title problem. Rather, the alleged buyers were voluntarily released from their earnest money contracts by Tri–Legends' president, Mallett.[7] The summary judgment record shows that Mallett released these buyers from their "contracts" when he was not required to. The earnest money contracts provided for a sixty day period for curing any purported title defects. Mallett released the buyers before this period had expired.

██ Next, Tri–Legends amended its petition and claimed that the title problem caused the failure of the entire project and sought damages in the millions based on lost profits. Alternately, Tri–Legends sought the value of the 4.58 acre tract on the date of closing, i.e., $10,000,000. Unfortunately for Tri–Legends, the summary judgment proof, even when viewed in the light most favorable to Tri–Legends, affirmatively shows that the sole cause of these alleged damages was Tri–Legends' own failure to make its loan payments to Allied.

Mallett states in his affidavit that, "... as a result of the title problem which surfaced in September of 1987, Tri–Legends did not pay Allied the September 30, 1987, payment due under the purchase money financing."[8] The record shows that when Tri–Legends failed to make its payment, **Allied** declared Tri–Legends in default and froze its construction account. From there, the "whole project [went] into a downward spiral." When the account was frozen, Tri–Legends was unable to pay its contractors and they

---

**7.** We use the term "contracts" here very loosely in that Mallett admitted that no earnest money had even been deposited with respect to eight of the contracts.

**8.** Mallett stated that the payment was missed because of the loss of the earnest money con-

tracts; however, this does not create a fact issue because as we previously noted, Mallett himself voluntarily released the buyers from those contracts before notifying appellees of the alleged title problem.

walked off the job and put liens on the property. Tri–Legends presented evidence that its sales force became demoralized and worried about salaries and the company's reputation.

Tri–Legends argues that all of this stemmed from the title problem caused by appellees. However, Tri–Legends own summary judgment proof shows the falsity of this claim. The damages allegedly incurred were caused by Tri–Legends' failure to make the September note payment to Allied. Every downward turn that the project took flowed from that action. The holding is supported by the fact that Tri–Legends did not even bring the purported title defect to appellees' attention until over two weeks after the September note payment was missed. This fact was conceded by Tri–Legends and is part of the summary judgment record.

We hold that for the reasons stated above, Tri–Legends was not entitled to recover any damages from appellees as a matter of law and this too was sufficient to support the trial court's judgment.

We affirm the trial court's judgment in favor of appellees. Because the trial court granted appellees' motion generally, we will uphold the judgment if any ground asserted in the motion is valid. *See Benavides v. Moore,* 848 S.W.2d 190, 192 (Tex.App.—Corpus Christi 1992, writ denied). The grounds discussed in this opinion are sufficient to support the trial court's judgment with respect to any attack levelled against it. Therefore, it is unnecessary to review Tri–Legends' remaining arguments.