**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 95-50693
(Summary Calendar)

FIRST STATE BANK OF CORPUS CHRISTI,

Plaintiff-Appellant,

versus

AMERICAN TITLE INSURANCE COMPANY,
a Florida corporation; FIDELITY NATIONAL
TITLE INSURANCE COMPANY,

Defendants-Appellees.

Appeal from the United States District Court
For the Western District of Texas

(A-93-CV-761)

June 19, 1996

Before WIENER, EMILIO M. GARZA, and PARKER, Circuit Judges.

PER CURIAM[*]:

Relying on a title insurance policy, Plaintiff-Appellant First

---

[*] Pursuant to Local Rule 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

State Bank of Corpus Christi (Bank)[1] contends that Defendant-Appellee American Title Insurance Company (American) must indemnify the Bank for the alleged reduction in fair market value of the insured real estate.  A title insurance policy insures against "losses" occasioned by the failure of title to real property; but here the Bank's title never failed.  By definition, then, any "loss" suffered by the Bank could not have been occasioned by title failure.  The judgment of the district court is therefore affirmed.

I

FACTS AND PROCEEDINGS

A.    BACKGROUND

In April 1985, Allied Chain Link Fence Company (Allied), a Texas Corporation, executed a $340,311.93 promissory note (Note) payable to the Bank.  To secure repayment, Allied's principals, Omer and Kathleen Evans, encumbered two tracts of real property as collateral by subjecting them to deeds of trust.  The Evans held title to both of these properties and represented to the Bank that property other than the two encumbered parcels constituted their homestead.  One of the pledged properties, an improved one-acre

---

[1] Two banks are actually involved in this litigation.  The insurance policy in question was originally issued to First National Bank of Austin; however, it failed in August 1989.  Shortly thereafter, First State Bank of Corpus Christi purchased all of First National Bank of Austin's assets, rights, and titles from the FDIC.  For the sake of clarity and because First State Bank of Corpus Christi now stands in the shoes of First National Bank of Austin, we will treat these two banks as one and refer only the "Bank" in this opinion.

2

tract located off Highway 290 East in Austin (Property), was Allied's business premises, and was situated in the proposed corridor from Highway 290 to the proposed site for the City of Austin's new international airport.[2]

In June 1985, American issued the Bank a "Mortgage Policy of Title Insurance" (Policy) on the Property in the amount of the Note. At or about the time the policy was issued, First National obtained an appraisal which valued the Property at between $260,000 and $350,000. As the exact fair market value of the Property does not affect the outcome of this appeal, we assume that when the policy was issued the fair market value of the Property was $350,000.

B.    THE BANKRUPTCY PROCEEDINGS

In 1989, Allied defaulted on the Note, and the Bank posted the Property for foreclosure in accordance with the terms of the deed of trust. In June 1990, before the foreclosure sale could take place, the Evans filed for protection under Chapter 11 of the Bankruptcy Code. As a result of that filing, the foreclosure sale was automatically stayed. In bankruptcy court, the Evans contended that the Property constituted a business homestead under Texas law, nullifying the Bank's lien. In October 1990, the Bank furnished American notice of the Evans' claim. In January 1991, a bankruptcy

---

[2] The other property was 122 acre tract located in Gillespie County, Texas. It has no significance in this case.

trial was averted when the Evans reached a settlement. As part of the settlement, the Evans agreed to the entry of an order that lifted the automatic stay.[3]

C.    THE FORECLOSURE SALE

The Bank rescheduled the foreclosure sale, this time for March 5, 1991. On the eve of this foreclosure sale, the Evans filed a petition in state court (Homestead Suit), reasserting that the Property was a business homestead and that the Bank's lien was void. The state court issued a temporary restraining order (again halting the foreclosure sale) and set the injunction hearing for March 11, 1991. At the hearing, the state court granted the Evans' request for a temporary injunction, setting the bond at $10,000. As the Evans were unable to post the required bond, however, the temporary injunction never went into effect and the temporary restraining order expired.

For yet a third time the Bank instituted foreclosure

---

[3] We are unable to discern from the record the precise terms of this "settlement." In its opinion, however, the district court stated:

> By January 16, 1991, the upcoming adversary proceeding in the bankruptcy court had been resolved by agreement with the bankruptcy attorney for Mr. and Mrs. Evans. Mr. and Mrs. Evans entered into an agreed order which lifted the automatic stay, so that the Bank could proceed forward with foreclosure of its lien on the Highway 290 Property.

Whatever the precise details of this settlement, neither party has urged that it stands as a substantive or procedural bar to the Homestead Suit or this suit.

4

proceedings, and this time it took place.  The Bank purchased the Property at the foreclosure sale in April 1991 for $154,070.01.

D.  POST-FORECLOSURE LITIGATION

Soon after the foreclosure sale, the Evans filed their first amended petition in the still-viable Homestead Suit, urging that Texas' homestead law invalidated the Bank's lien and thus nullified the foreclosure sale.  The state court set the Homestead Suit for a jury trial to begin in September 1992.[4]  Apparently, the Homestead Suit was not reached in September and had to be rescheduled for a future date.  In October 1992, American settled with the Evans for $80,000.  In exchange, the Evans executed a quit claim deed releasing forever all rights, titles, and interests in the Property.

Meanwhile, during the year and one-half that the Homestead Suit had been pending, the fair market value of the Property had dropped precipitously.[5]  With the predicate events laid out, we

---

[4] Expert testimony from practitioners in Travis County courts established that, under the docket system employed by the Travis County courts, all cases are carried on a central docket.  Cases set for trial are assigned a docket position based on when they are set for trial.  If a case is not reached in the week it is set for trial, it is not carried over to the following week. Instead, the case has to be reset on the central docket for a new date in the future.

[5] The parties do not appear to question that the fair market value of the Property dropped during the pendency of the Homestead Suit; they only question how far it dropped.  The Bank asserts in its brief that because the proposed airport project had been canceled and the FDIC and RTC had been selling properties adjacent to the Property at "fire sale" prices, the

turn now to this case.

E.    THE TITLE POLICY LITIGATION

In November 1993, the Bank brought this suit against American in state court for breach of contract and violations of Texas insurance law.[6]  The Bank contends that American breached the Policy by refusing to indemnify the Bank for the diminution of the Property's fair market value, and breached its duty of good faith and fair dealing by failing to settle with the Evans in a timely manner.  American removed the case to federal district court on grounds of diversity, after which it proceeded to trial.

In July 1995, after a bench trial, the district court filed its findings of fact and conclusions of law.  Based on its findings, the district court held, <u>inter alia</u>, that "American acted in accordance with its rights and obligations under the Policy" and that "American did not violate any duties of good faith or engage in any unfair or deceptive acts or practices prohibited by the Texas Insurance Code or other applicable Texas insurance law." Accordingly, the district court rendered final judgment in favor of

---

Property was worth a mere $30,000.  The district court made no determination on the fair market value of the Property subsequent to the Homestead Suit.  As the fair market value of the Property after the Homestead Suit has no effect on the outcome of this appeal, we assume only that it dropped precipitously.

[6] Fidelity National Title Insurance Company (Fidelity National) was also named as a defendant in the original complaint.  After the case was removed to federal court, the claims against Fidelity National were dismissed without prejudice.  Fidelity National is not a party to this appeal.

American.   The Bank timely appealed.

II

DISCUSSION

In this appeal, the Bank renews its two basic arguments: (1) the delay associated with American's defense of the Homestead Suit permitted the fair market value of the Property to decline while the Bank was powerless to sell the Property at a favorable price, as a result of which American is obligated under the Policy to indemnify the Bank for its loss; and (2) the unreasonable delay in settling the Homestead Suit was a breach of American's duty of good faith and fair dealing, delaying a timely sale due to the resulting delay in establishing clear title, thereby preventing the Bank from realizing a higher return on its collateral.   For the reasons stated more fully below, we, like the district court before us, find both of these arguments unavailing.

A.   STANDARD OF REVIEW

Our standard of review for a bench trial is well established: We review findings of fact for clear error, and legal issues de novo.[7]

B.   DID AMERICAN BREACH THE POLICY?

In Texas, insurance policies are interpreted under the rules

---

[7] Federal Deposit Insurance Co. v. McFarland, 33 F.3d 532, 537 (5th Cir. 1994)(citing Seal v.  Knorpp, 957 F.2d 1230, 1233 (5th Cir. 1992)).

of construction that are applicable to contracts generally.[8] We shall not rewrite the provisions of a policy; instead, we shall enforce them as written.[9] Whether a provision is ambiguous is a question of law.[10] A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning."[11]

We find no ambiguity in the relevant portions of the Policy. American insured the Bank's <u>title</u> to the Property against all adverse <u>title</u> claims. The coverage clause in the Policy reads in pertinent part as follows:

> [A]ll losses or damages not exceeding [340,311.93] which the insured . . . may sustain or suffer <u>by reason of the failure of, defects in, encumbrances upon, or liens or charges against the title</u> of the mortgagors or grantors to the estate or interest in the [Highway 290 property], existing at or prior to the date of this policy . . . and . . . subject to the Conditions and Stipulations hereof (emphasis added).

One such condition, which is specified with precise language in the Policy, is American's reserved right to defend or settle a suit brought by an adverse claimant before having to pay the insured:

> At [American's] option; [sic] it may (a) re-establish the status quo of the Insured by effecting settlement or

---

[8] <u>Barnett v. Aetna Life Ins. Co.</u>, 723 S.W.2d 663, 665 (Tex. 1987).

[9] <u>Yancey v. Floyd West & Co.</u>, 755 S.W.2d 914, 918 (Tex.App.--Fort Worth 1988, writ denied).

[10] <u>Yancey</u>, 755 S.W.2d at 917.

[11] <u>Coker v. Coker</u>, 650 S.W.2d 391, 393 (Tex. 1983).

> dismissal of such action or proceeding; (b) at its own
> cost and charges pursue such action or proceeding to
> final determination in the court of last resort and
> comply with the judgment of the court in behalf of the
> Insured up to the amount of this policy; (c) at any time
> pay the insured up to the amount of this policy in
> discharge of all obligations hereunder.

Clearly, American contracted to indemnify the Bank for its losses up to the limit of the Policy, but only in the event that losses result from failure of title. Moreover, the policy language last quoted above expressly permits American to exercise its right to pursue final judicial determination, or to settle, before it can be said that the insured title has failed. It follows that if American should engage in litigation or settlement negotiations, or both — whether in series or in parallel — and eventually preserve its insured's title, American cannot be held responsible for the diminution in the fair market value of the Property resulting from the vicissitudes of the market place that occurred while American was exercising its lawful rights in a reasonable and timely manner.

We return now to the events in the Homestead Suit: The Evans made an adverse claim. American exercised its rights first to defend and eventually to settle the Homestead Suit. As a result, the Bank's title to the Property never failed; on the contrary, its title was preserved through American's efforts and its expenditure of considerable sums. As the Bank's title did not fail, it is impossible for any loss to be attributed to a failure of title. Absent failure of title, any loss suffered by the Bank would have

9

to be attributable to some other contingency or fortuity, none of which were insured against by American. Simply put, American insured the Bank's title to the Property, not the Property's fair market value. Accordingly, we agree with the district court's conclusion that American did not breach the Policy.

C.    DUTY OF GOOD FAITH AND FAIR DEALING

Under Texas law, a cause of action for breach of the duty of good faith and fair dealing arises when there is no reasonable basis for denial or delay.[12] The bank contends that American had no reasonable basis to contest the Evans' claim. We disagree. In the context of title insurance, a title insurance company may elect to defend a suit brought by an adverse claimant before having to pay the insured.[13] More specifically, in the Policy, American expressly reserved the right to defend, or to settle, or to defend and then settle, any adverse claim against the Property's title. As American had both a general legal right and an express contractual right to defend or settle any adverse claim, American did not breach its duty of good faith by contesting and then settling the Evans' claim.

---

[12] Tri-Legends Corp. v. Ticor Title Ins. Co., 889 S.W.2d 432, 442 (Tex.App.--Houston (14th Dist.) 1994, writ denied); see also Arnold v. National County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987).

[13] Martinka v. Commonwealth Land Title Ins. Co., 836 S.W.2d 773, 776 (Tex.App.--Houston (1st Dist.) 1992, writ denied)(citing Southern Title Guar. Co. v. Prendergast, 494 S.W.2d 154, 156 (Tex. 1973)).

Alternatively, the Bank insists that American breached its duty of good faith by taking an unreasonable amount of time to resolve the Homestead Suit. Again, we disagree. Relying on considerable documentary evidence, the district court made extensive, detailed findings of fact regarding the dates on which relevant events in the litigation occurred. After listening to several expert witnesses testify about the procedures and timing involved in trying a case in the courts of Travis County, the district court concluded that "American did not unreasonably delay in the litigation and settlement of the Evans' homestead claim." Based on this determination, which we do not find to be clearly erroneous, the district court held that American had not breached its duty of good faith and fair dealing or any other duty under Texas insurance law, a legal conclusion in which we discern no reversible error.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.